UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

BONA FIDE DEMOLITION AND RECOVERY,          CIVIL ACTION
LLC

VERSUS                                      NO: 07-3115

CROSBY CONSTRUCTION COMPANY OF              SECTION: R(1)
LOUISIANA, INC., CROSBY
CONSTRUCTION, LLC, CROSBY
ENTERPRISES, LLC, V. CROSBY
CONSTRUCTION, LLC, STEPHEN BARBUTO,
LAVERNIE CROSBY, JR., THOMAS KARAM,
CAPES INVESTMENT, LLC, JOHN E.
SEAGO, SEAGO & CARMICHAEL, APLC,
ANTHONY BARBUTO, WEATHERTIGHT
ROOFING, INC., BALTIMORE INDUSTRIES,
INC.,

**ORDER AND REASONS**

Before the Court are four motions to dismiss submitted by

defendants Baltimore Industries ("BI") and Capes Investment, LLC

("Capes"). (R. Doc. 318, 353, 354, and 367). BI and Capes seek

dismissal of all claims filed against them by plaintiff Bona Fide

Demolition and Recovery, LLC ("Bona Fide"), and co-defendants and

cross-claimants Stephen Barbuto, Anthony Barbuto and Weathertight

Roofing, Inc ("Weathertight"). (R. Doc. 318, 353, 354, 367).

The motions allege (1) that this Court lacks personal

jurisdiction over BI and Capes, and (2) that Bona Fide, Anthony

Barbuto, Stephen Barbuto, and Weathertight, collectively

"claimants," have not stated a cognizable claim for relief

against BI or Capes under Federal Rule of Civil Procedure 12(b)(6). (R. Doc. 318, 353, 354, 367). For the following reasons, the Court GRANTS Capes's motions and DENIES BI's motions.

**I.      BACKGROUND**

**A.    Factual Background**

**1.    The Alleged Fraudulent Scheme**

This suit arises out of a failed business relationship between plaintiff Bona Fide and defendants Crosby Construction Company of Louisiana, Inc. ("CCCL"), Crosby Construction, LLC ("CC"), Crosby Enterprises, LLC ("CE"), V. Crosby Construction, LLC ("VCC"), V. Crosby Company, LLC ("VC"), and Crosby Development Enterprises, LLC ("CDE"), collectively referred to herein as the "Crosby Companies". Capes, BI, Seago & Carmichael APLC ("S&C"), Weathertight, and Continental Casualty Company ("Continental") are also named as defendants in this suit. In addition, the following individuals are named defendants: Lavernie Crosby, Jr. ("Crosby"), Thomas Karam ("Karam"), John E. Seago ("Seago"), Stephen Barbuto and Anthony Barbuto. (R. Doc. 228). Stephen Barbuto, Anthony Barbuto, and Weathertight have also filed separate cross-claims against the Crosby Companies, BI, Capes, Crosby, Karam, Seago, Seago & Carmichael, and Continental. (R. Doc. 332, 331, and 365).

Claimants allege that BI and Capes were part of a fraudulent scheme to induce claimants to form joint business ventures with the Crosby Companies in which each invested money under false pretenses. (R. Doc. 228, 331, 332, and 365). On November 21, 2006, representatives from Bona Fide, a demolition company based in Colorado, met with Crosby and Seago, Crosby's legal counsel, in Greenwood Village, Colorado. There, Crosby and Seago discussed with Bona Fide representatives the potential to go into business together. Crosby and Seago represented that the Crosby Companies were minority owned, and thus uniquely positioned to receive government demolition contracts earmarked for minority owned businesses following Hurricane Katrina. Moreover, Crosby and Seago further represented that the Crosby Companies had already received a number of government earmarked contracts, but were seeking to partner with Bona Fide because the Crosby Companies did not possess the equipment or personnel needed to actually perform the work at that time. To help substantiate these claims, Karam, who did not physically attend the Colorado meeting, had prepared certain marketing materials that Crosby and Seago presented to Bona Fide. The materials included a syllabus, which described the various Crosby Companies, company overviews, and summaries of each of the Crosby Companies' functional capabilities. Karam also prepared financial spreadsheets for Bona Fide's use, which included information about the Crosby

Companies' revenues, including the government contracts the Crosby Companies had allegedly obtained. In the weeks after the Colorado meeting, the parties discussed many aspects of the proposed deal. During this time, Karam communicated with Bona Fide representatives via email and phone from a Maryland office location. The Maryland office location functioned as the offices for BI, Capes, and the Crosby Companies.

Bona Fide agreed to form a joint venture with Crosby and the Crosby Companies. Before Bona Fide transferred any money, Crosby and Seago outlined how Bona Fide's invested money would be spent and reassured Bona Fide that New Orleans operations could start soon. Specifically, Crosby and Seago assured Bona Fide that they could set up offices in New Orleans and hire licensed and experienced subcontractors capable of completing any demolition contract the joint venture received. With these representations in mind, Bona Fide wired the initial capital for the business, as per Karam's instructions. Bona Fide did so by (1) lending Crosby $20,000 as an advance, which Crosby personally guaranteed; (2) signing a Letter of Intent with Crosby to enter into a joint business enterprise; (3) lending $105,000 to both CCCL and CC, which CE and Crosby guaranteed; and (4) paying CCCL $75,000 not to "have further contact or communication with other potential investors." (R. Doc. 228, Ex. B, C, and D). Bona Fide completed the last of the transactions on December 5, 2006.

After the initial financing was complete, Bona Fide sent several representatives to New Orleans. There, Seago, Crosby, and Karam again told Bona Fide that the Crosby Companies had functional offices, licensed staff, and pre-existing government contracts. Thus assured, Bona Fide moved both its equipment and personnel to New Orleans. When Bona Fide arrived, however, Bona Fide found no functional offices; the Crosby Companies did not employ licensed and credentialed staff; and the Crosby Companies did not have government contracts. Consequently, Bona Fide leased office space and established operations for the joint business enterprise on its own.

In addition, Bona Fide learned after moving to New Orleans that Crosby was actively seeking additional investors in contravention of the nonsolicitation agreement the parties had agreed upon in Colorado. One such investor was Stephen Barbuto, whom Crosby allegedly approached as a potential business partner in the fall of 2006. Seago, Karam, and Crosby represented to Stephen Barbuto that Crosby was seeking partners/investors for the Crosby Companies. After negotiations, Stephen Barbuto and Crosby agreed to form a partnership effective January 1, 2007. According to Barbuto, as a result of the partnership, he was to own 49% of any entity Crosby owned. To consummate the deal, Stephen Barbuto opened various bank accounts, as per Karam's instructions, and with the aid of his son Anthony Barbuto, wired

money from New Jersey and Florida to various Crosby Companies.
Further, in early January 2007, Stephen Barbuto and Anthony
Barbuto allegedly leased over $3,000,000 in equipment to be used
by Crosby to perform demolition work in the New Orleans area.
Weathertight, a New Jersey company owned by Stephen Barbuto, also
agreed to fund up to $5,000,000 in future advances to CC.
Allegedly, Crosby and Karam transferred funds advanced by
Weathertight to BI, Capes, or Crosby Companies not party to the
Barbuto-Crosby partnership for their own personal use.

In January 2007, the alleged scheme began to unravel. Bona
Fide learned that the Crosby Companies did not have the
appropriate licenses to conduct demolition work in the State of
Louisiana. As a result, the Crosby Companies could not
legitimately receive government contracts. After this discovery,
Bona Fide met with Crosby and Seago to discuss the return of its
invested money. Bona Fide did not receive any of its investment
back. In February 2007, Bona Fide broke its lease for housing
and office space and moved its personnel and equipment back to
Colorado.

Crosby allegedly breached his agreements with Stephen
Barbuto as well. For example, Stephen Barbuto alleges that
Crosby failed to make payments for the equipment that he and his
son Anthony leased. Like Bona Fide, the three cross-claimants
demanded a return of their money. And, like Bona Fide, they have

not received any of their investments back.   The leased
equipment has since been repossessed, and separate lawsuits have
been filed against Stephen Barbuto to collect on the debts owed
for the leased equipment.

**B.   Procedural Background**

Bona Fide initially filed this suit on June 4, 2007,
alleging a general scheme to defraud by the named defendants.
(R. Doc. 1).  At that time Bona Fide named Crosby, Barbuto, and
the Crosby Companies as defendants.  *Id.*  The complaint did not
name BI or Capes.  (R. Doc. 1).  On February 20, 2009, this Court
dismissed Bona Fide's complaint without prejudice because the
Court lacked subject matter jurisdiction over the case as
plaintiffs had pleaded it.  (R. Doc. 199 and 202).  Bona Fide
moved the Court to reconsider.  (R. Doc. 203).

Upon reconsideration, the Court granted Bona Fide time to
amend its complaint to establish jurisdiction.  (R. Doc. 219).
On April 28, 2009, Bona Fide did so by filing a Second Amended
Complaint.  (R. Doc. 220).  Like the First Amended Complaint, the
Second Amended Complaint did not name BI and Capes as defendants.
(R. Doc. 220).  After Bona Fide amended its complaint for a third
time, BI and Capes were finally added.  (R. Doc. 233).  Stephen
Barbuto, Anthony Barbuto, and Weathertight answered Bona Fide's
Third Amended Complaint and filed cross-claims against the Crosby
Companies, Crosby, and Karam.  (R. Doc. 331, 332, and 365).

While the three defendants each filed cross-claims against BI, only Weathertight asserts a claim against Capes. (R. Doc. 365).

BI and Capes now move the Court to dismiss all claims against them. (R. Doc. 318, 353, 354, 367). The two defendants argue that the Court lacks personal jurisdiction and that the claimants have not stated a cognizable claim against them. *Id.*

## II. PERSONAL JURISDICTION

### A. Legal Standard

When a nonresident defendant moves to dismiss for lack of personal jurisdiction under Rule 12(b)(2), the plaintiff bears the burden of showing that personal jurisdiction exists. *See Stuart v. Spademan*, 772 F.2d 1185, 1192 (5th Cir. 1985). If the district court declines to hold a full evidentiary hearing, the plaintiff need only make a *prima facie* showing of jurisdiction. *See Wilson v. Belin*, 20 F.3d 644, 648 (5th Cir. 1994). In making its determination without an evidentiary hearing, the court may consider "affidavits, interrogatories, depositions, oral testimony, or any combination of the recognized methods of discovery." *Thompson v. Chrysler Motors Corp.,* 755 F.2d 1162, 1165 (5th Cir. 1985). The allegations in the complaint must be taken as true unless controverted by affidavits, and all factual conflicts must be resolved in favor of the plaintiff. *See id.* "Eventually, of course, the plaintiff must establish jurisdiction

by a preponderance of the evidence, either at a pretrial evidentiary hearing or at trial. But until such a hearing is held, a *prima facie* showing suffices, notwithstanding any controverting presentation by the moving party, to defeat the motion." *DeMelo v. Toche Marine, Inc.*, 711 F.2d 1260, 1271 n. 12 (5 Cir. 1983) (quoting *Marine Midland Bank, N.A. v. Miller*, 664 F.2d 899, 904 (2d Cir. 1981)(cited in *Brown v. Flowers Industries, Inc.*, 688 F.2d 328, 333 (5th Cir. 1982))).

**B.    "Minimum Contacts"**

A court has personal jurisdiction over a nonresident defendant if: (1) the forum state's long-arm statute confers personal jurisdiction over that defendant; and (2) the exercise of jurisdiction complies with the Due Process Clause of the Fourteenth Amendment. *Latshaw v. Johnston*, 167 F.3d 208, 211 (5th Cir. 1999). Because Louisiana's long-arm statute extends jurisdiction to the full limits of due process, *see* La. Rev. Stat. § 13:3201(B), a federal court sitting in Louisiana need determine only whether the exercise of its jurisdiction satisfies the requirements of constitutional due process.

The exercise of personal jurisdiction over a nonresident defendant satisfies due process when: (1) the defendant has purposefully availed itself of the benefits and protections of the forum state by establishing "minimum contacts" with that state; and (2) the exercise of jurisdiction does not offend

9

"traditional notions of fair play and substantial justice."
*Latshaw*, 167 F.3d at 211 (quoting *Int'l Shoe Co. v. Washington*,
326 U.S. 310, 316 (1945)). The defendant's connection with the
forum state must be such that he "should reasonably anticipate
being haled into court" there. *Latshaw*, 167 F.3d at 211 (quoting
*World-Wide Volkswagen Corp. v. Woodson*, 444 U.S. 286, 297
(1980)).

Minimum contacts may give rise to either "specific"
jurisdiction or "general" jurisdiction. *Helicopteros Nacionales
de Colombia, S.A. v. Hall*, 466 U.S. 408, 414 n.8-9 (1984).
Specific jurisdiction exists when a plaintiff's cause of action
arises from, or is related to, the nonresident defendant's
minimum contacts in the forum state. *Id.* at 414 n.8; *Wilson*, 20
F.3d at 647. General jurisdiction exists if the defendant has
engaged in "continuous and systematic" activities in the forum
state. *Helicopteros*, 466 U.S. at 415; *Wilson*, 20 F.3d at 647.

Courts presume the institutional independence of related
corporations, such as a parent and its subsidiary, when they
determine if one corporation's contacts with a forum can be the
basis of jurisdiction over a related corporation. *Dickson
Marine, Inc. v. Panalpina, Inc.*, 179 F.3d 331, 338 (5th Cir.
1999). It is established in the Fifth Circuit that when "a
wholly owned subsidiary is operated as a distinct corporation,
its contacts with the forum cannot be imputed to the parent."

*Southmark Corp. v. Life Investors, Inc.*, 851 F.2d 763, 773-74
(5th Cir. 1988); *see also Hargrave v. Fibreboard Corp.*, 710 F.2d
1154, 1160 (5th Cir. 1983) (finding that when parent and
subsidiary maintain separate and distinct corporate entities,
presence of one may not be attributed to the other).  To fuse the
two companies for jurisdictional purposes, there must be "proof
of control by the parent over the internal business operations
and affairs of the subsidiary." *Hargrave*, 710 F.2d at 1160.  The
theory is that because the two companies are the same entity,
"the jurisdictional contacts of one are the jurisdictional
contacts of the other for the purposes of the *International Shoe*
due process analysis." *Patin v. Thoroughbred Power Boats, Inc.*,
294 F.3d 640, 653 (5 Cir. 2002) (citing *Lakota Girl Scout
Council, Inc. v. Havey Fund-Raising Mgmt., Inc.*, 519 F.2d 634,
637-38 (8th Cir. 1975) (explaining that "if the corporation is
[the individual defendant's] alter ego, its contacts are his and
due process is satisfied")).

The parties do not dispute that BI and Capes are not
subsidiaries of the Crosby Companies.  (R. Doc. 351 and 384).
Instead, the claimants argue that BI and Capes, though separate
corporations in form, are *actually* part of a single business
enterprise with the Crosby Companies.  (R. Doc. 351 and 384).
The four claimants therefore argue that the Court should
disregard the corporate form separating BI and Capes from the

11

Crosby Companies, and attribute the Crosby Companies' minimum contacts to BI and Capes. *Id.* Both BI and Capes argue that they are separate and independent entities and that neither has sufficient contacts with Louisiana on its own to justify the exercise of jurisdiction over it. (R. Doc. 318, 353, 354, 367).

**C.   Single Business Enterprise Theory**

"Corporations function as distinct legal entities, separate from the individuals who own them, and their shareholders are not generally liable for the debts of the corporation." *Hollowell v. Orleans Regional Hosp. LLC*, 217 F.3d 379, 385 (5th Cir. 2000) (citing *Riggins v. Dixie Shoring Co.*, 590 So.2d 1164, 1167 (La. 1991)), reh'g or reh'g en banc denied, 232 F.3d 212 (5th Cir. 2000). The limited liability provided to shareholders by the corporate form not only promotes business and industry, but also encourages investment in high-risk areas by insulating personal wealth from inherent business risks. *See* LSA-R.S. 12:93(B); *Buckeye Cotton Oil Company v. Amrhein*, 121 So. 602 (La. 1929) (stating economic rational for corporate limitation of liability). Courts may disregard the concept of corporate separateness, *i.e.* pierce the corporate veil, when a corporate entity is used to "defeat public convenience, justify wrong, protect fraud, or defend crime." *See Smith v. Cotton's Fleet Serv., Inc.*, 500 So.2d 759, 762 (La. 1987). Likewise, when two or more corporations constitute a single business enterprise

12

("SBE"), a court may "disregard the concept of corporate separateness and extend liability to each of the affiliated corporations."[1] *Brown v. Auto. Cas. Ins. Co.*, 644 So.2d 723, 727 (La. Ct. App. 1994); *see also In re: Ark-La-Tex Timber Co.*, 482 F.3d 319, 335 (5th Cir. 2007)(citing Louisiana appellate court cases); *Gundle Lining Construction Co. v. Adams County Asphalt, Inc.*, 85 F.3d 201 (5th Cir. 1996)(discussing piercing the corporate veil between two affiliated companies in terms of "alter ego" theory). A SBE "occurs when a corporation is found to be the 'alter ego, agent, tool or instrumentality of another corporation.'" *Dishon v. M. Ponthie*, 918 So.2d 1132, 1135 (La. Ct. App. 2005) (citing *Green v. Champion Insurance Co.,* 577 So.2d 249, 257 (La. Ct. App. 1991)).

SBE theory differs from traditional veil piercing in two respects. First, when jurisdiction is at issue, traditional veil piercing operates vertically to allow the Court to impute a corporation's contacts to its shareholders. *Patin,* 294 F.3d at 653. Although some courts use traditional veil piercing horizontally to fuse two affiliated corporations, *see e.g., Miller v. Entergy Services, Inc.*, 913 So. 2d 143, 148 (La. App. Ct. 2005) (citing *Green*, 577 So. 2d 249, 257), *writ denied*, 580 So.2d 668 (La. 1991)); *F.G. Bruschweiler (Antiques) Ltd. v. GBA*

---

[1] The SBE theory has not been adopted in certain states. *See, e.g., Verni ex rel. Burstein v. Harry M. Stevens, Inc.*, 903 A.2d 475 (N.J. App. Ct. 2006).

*Great Britain Antiques, LLC*, 860 So.2d 644, 651 (La. App. Ct.
2003), SBE theory can be used to fuse either affiliated or
unaffiliated corporations, but not to impute corporate
jurisdictional contacts to shareholders. *See Grayson v. R.B.
Ammon & Assocs., Inc.*, 778 So.2d 1 (La. Ct. App. 2000), writs
denied,782 So.2d 1026 (La. 2001), 782 So.2d 1027 (La. 2001);
*Holly & Smith Architects, Inc. v. St. Helena Congregate Facility*,
872 So.2d 1147, 1156 (La. Ct. App. 2004). Second, at least under
Louisiana law, the legal standard utilized in traditional veil
piercing and SBE cases is different. Traditional veil piercing
cases require consideration of four or five primary factors, and
then an inquiry into the "totality of the circumstances."
*Riggins*, 590 So.2d at 1168 (considering commingling of funds,
adherence to corporate formalities, under-capitalization, failure
to provide separate bank accounts, and holding of regular
shareholder meetings). SBE theory, on the other hand, uses an
eighteen-factor test, in which no factor is dispositive. The
list of eighteen factors is non-exhaustive, and the Court must
still consider the "totality of the circumstances" in each case.
*See Green*, 577 So. 2d at 251-53 (La. App. Ct. 1991) (eighteen-
factor test). The eighteen factors include whether one
corporation has sufficient ownership interest in another to give
it actual working control, whether common directors or officers
exist, whether a unified administrative control apparatus is

present, and whether the business functions of the companies are similar or supplementary. *In re New Orleans Train Car Leakage Fire Litigation*, 690 So.2d at 257 (citing *Green*, 577 So. 2d at 251-53). Other factors include whether the directors of one corporation act independently in the interest of that corporation or instead in the interest of another corporation, whether one corporation finances or pays the salaries and expenses of another corporation, and whether one corporation is inadequately capitalized or receives no business other than that given to it by another corporation. *Id.* In addition, a court must also evaluate whether a corporation uses the property of another corporation as its own, complies with corporate formalities, or keeps common employees or offices with another corporation. *Id.* And lastly, a court may look at the financial transactions between companies to determine whether two companies that are separate in form are in fact a single enterprise. *Id.* For example, a court may consider any undocumented transfers of funds, unclear allocation of profits and losses, and excessive fragmentation of a single business into separate corporate entities for purposes of recording profits and losses. *Id.; see also Rive v. Briggs of Cancun, Inc.*, 82 Fed.App'x 359 (5th Cir. 2003) (unpublished) (restating *Green's* eighteen factors).

The governing eighteen-factor standard was first articulated in *Green v. Champion Ins. Co.,* 577 So.2d 249. In *Green*, a

special liquidator moved to enjoin the officers, directors, and other members of an insolvent insurance company from transferring assets to its parent corporation and other affiliated entities in its business group. *Id.* at 253-254. *Green* concerned, albeit in the insurance context, the paradigmatic veil-piercing situation—the defrauding of a creditor and the creditor's efforts to track down the assets of an insolvent debtor. *Green* 577 So.2d at 258. *Green* differed from traditional veil-piercing cases, however, in that the insurer transferred assets to its sister company, rather than to its shareholders. *Id.; See also, Abraham v. Lake Forest, Inc.*, 377 So.2d 465, 469 (La. Ct. App. 1979) (veil piercing appropriate when commingling of funds between shareholder and corporation occurred). To protect against the transfer of assets between affiliated corporations as a means of perpetuating fraud, the *Green* Court held that the insurer and its "related entities" were a SBE for liquidation purposes. *Green*, 577 So.2d at 258 (noting that the purpose of SBE theory was to "prevent fraud or to achieve equity") (citing *Glenn v. Wagner*, 313 S.E.2d 832, 839 (N.C. App. Ct. 1984). In so doing, the *Green* Court articulated and applied the eighteen factors listed above. *Id.* The court stated:

> In terms of structure, finance, and operations, this evidence demonstrates that the corporations were not operated as separate entities. They functioned as a single economic entity despite the internal compartmentalization of ownership and operation by means of separate incorporation.

16

*Id.* at 259.

Some courts have even extended the theory to unaffiliated corporations that lack common ownership, noting that "[i]f one corporation is wholly under the control of another, the fact that it is a separate entity does not relieve the latter from liability." *Grayson,* 778 So. 2d at 14. While yet to apply the *Green* factors, both the Louisiana Supreme Court and United States Fifth Circuit Court of Appeals have cited *Green* in reference to Louisiana's SBE doctrine. *See Brown v. ANA Ins. Group*, 994 So.2d 1265, 1256 fn. 2 (La. 2008); *Hollowell v. Orleans Regional Hosp. LLC*, 217 F.3d 379, 387 (5th Cir. 2000).

*Green's* eighteen-factor test is difficult to apply, as it provides no guidance as to the weight to be given any of the eighteen factors or whether any, all or some of the factors must be present to find a SBE. Further, some of the factors are perfectly consistent with legitimate, efficient business operations, such as common control, common employees, officers, and directors, shared offices, and some form of centralized accounting. *See* James Dunne, *Taking the Entergy out of Louisiana's Single Business Enterprise Theory*, 69 La. L.R. 691, 695 (2009). This suggests that the doctrine should be applied with care so as not to discourage business development. *Green* itself suggests that the purpose of the doctrine is the same as traditional veil piercing: to prevent fraud or achieve equity.

*Compare Green*, 577 So.2d at 258; *with Riggins v. Dixie Shoring Co., Inc.,* 590 So.2d 1164, 1168 (La. 1991) (noting that veil-piercing is most appropriate to prevent the use of the corporate form in the defrauding of creditors); *and Martin v. D.B. Martin Co.*, 10 Del.Ch. 211, 215 (Del. Ch. 1913) (stating that corporate fiction will "never [be] resorted to when it would work an injury to any one [sic]"). Given that claimants invoke SBE doctrine to challenge an allegedly fraudulent enterprise, the Court finds that its application here will not extend the doctrine beyond manageable parameters.

It is well established law that a Court may impute the minimum contacts of one company to another based on various veil piercing theories. *See, Patin,* 294 F.3d at n. 18 (citing circuit cases and different veil piercing theories, including alter-ego theory and "reverse" veil piercing). Accordingly, the Court will analyze whether the jurisdictional contacts of the Crosby Companies may be imputed to BI or Capes under *Green's* eighteen factors. For the following reasons, the Court answers that question affirmatively for BI, and negatively for Capes.

## D.   Baltimore Industries

BI argues that the Court does not have jurisdiction because sufficient minimum contacts do not exist between BI and Louisiana independent of BI's involvement with the Crosby Companies. (R. Doc. 318, 341, 353, 354, 367). BI does not maintain offices or

18

employees in Louisiana, and BI appears to have made only one sale in which its goods may have eventually been used in Louisiana. (R. Doc. 341, Harkness Aff.). While it is true that these contacts alone do not support the exercise of jurisdiction over BI, the Court's inquiry is not at an end. Claimants argue that BI along with the Crosby Companies formed a SBE. (R. Doc. 351). Before considering whether this is the case, it is necessary to determine the basis of the Court's jurisdiction over the Crosby Companies.

Each of the Crosby Companies is organized under the laws of Louisiana, with the exception of CE, which is organized under the laws of Maryland. (R. Doc. 351, Ex. C, Ex. G, Ex. H). The Crosby Companies have conducted and continue to conduct business in and around the New Orleans, Louisiana area, including but not limited to the allegedly fraudulent transactions that underlie this case. (R. Doc. 228). Such contacts with Louisiana are at least "minimal contacts" for jurisdictional purposes, and BI and Capes do not argue otherwise. *See Access Telecom, Inc. v. MCI Telecommunications Corp.,* 197 F.3d 694, 716 (5th Cir. 1999).

The Court must next inquire whether the Crosby Companies and BI constitute a SBE under *Green*. BI argues that no SBE exists. (R. Doc. 348). In particular, BI argues that even though Crosby worked for BI in the past and Crosby and Karam considered "teaming up" in the future, no business relationship ever

materialized. (R. Doc. 341). BI also points out that no common ownership exists and that BI's business is otherwise unconnected to demolition work in Louisiana. *Id.*

Significant *Green* factors suggest, however, that BI and the Crosby Companies constitute a SBE. BI and the Crosby Companies use the same office space and share resources, including servers, fax machines, and e-mail accounts.[2] (R. Doc. 351, Ex. X); (R. Doc. 351, Ex. A, Crosby Dep. at 73); (R. Doc. 351, Ex. A, P. Karam Dep. at 12) ("Q: Why was it that [Crosby's] emails from Crosby Construction were leaving through the server at Baltimore Industries? A: Because the server in Baltimore Industries we are sharing."); (R. Doc. 351, Ex. L). Although, Karam is the president of BI, the bookkeeper and tax preparer for the Crosby Companies and BI, and is a member of the board of CE, his role is much greater. (R. Doc. 351, Ex. A, Karam Dep. at 94-95). Karam controls the financial operations of both BI and the Crosby Companies. (R. Doc. 351, Ex. A, Crosby Dep. at 33)(Crosby did not control daily operations); *Id.* at 206 (Karam wrote the checks); (R. Doc.l 351, Ex. A, Crosby Dep. at 29-30, 33) (Karam handled the businesses); *Id.* at 224 (Karam controlled the

---

[2] When claimants communicated with Karam in regard to their investments with the Crosby Companies, Karam sent emails from his BI email account and set-up conference calls through BI's offices. (R. Doc. 351, Ex. X). Moreover, emails sent from Karam's personal AOL account appear to the recipient as if sent from a Crosby Construction email address. (R. Doc. 351, Ex. A, Crosby Dep. at 272).

finances of the Crosby Companies); *Id.* at 206 (Karam wrote the
checks for the Crosby Companies). Further, the finances of BI
and the Crosby Companies are intermingled. BI provides the
Crosby Companies with money in the form of undocumented interest-
free "handshake loans" for which BI is not repaid. (R. Doc. 351,
Ex. A, Karam Dep. at 41) ("Q: When Baltimore Industries would
wire money to Crosby, was there any loan agreements or paperwork
that was drawn up? A: No. Q: It was just done on a handshake?
A: It was.") ("A: If Crosby didn't have money or whatever, we had
to wire some money, whatever was expedient. Q: But I still don't
understand why Baltimore Industries would wire money to Crosby if
there's no relationship between the two companies. A: We were
trying to help them get along."). BI frequently withdraws money
from the Crosby Company accounts for various expenses. (R. Doc.
351, Ex. S). BI also utilizes a joint bank account with one of
the Crosby Companies. Specifically, the evidence demonstrates
that BI and CCCL wrote two separate checks from the same
Louisiana bank account. (R. Doc. 351, Ex. A, Crosby Dep. at 294-
95) ("Q: How could Baltimore Industries and Crosby Construction
be writing checks from the same account number when they're two
separate companies? A: I don't know. They've got completely
different check numbers.") ("Q: Why would Balitmore Industries
have checks with that account number and Crosby Construction also
have checks with that account number?" A: I have no idea."); (R.

Doc. 351, Ex. N)(checks); (R. Doc. 351, Ex. K)(more checks).  BI
argues that the two companies did not use the same account
because the two checks are not copies of "actual paper checks,"
but rather "check by phone data" that included BI's name and
address by mistake.  (R. Doc. 341).  On their face, however, the
two checks are from separate companies, BI and CCCL, and have
identical routing and account numbers.  Because the Court must
resolve any issue of fact in claimants' favor (*see Thompson v.
Chrysler Motors Corp.,* 755 F.2d at 1165), the Court finds that
the checks evince BI's joint banking activity with the Crosby
Companies.  And lastly, BI does not observe many corporate
formalities that might indicate its separateness, including the
issuance of stock, annual shareholder meetings, formal board
meetings, and corporate authorization for major transactions.
(R. Doc. 351, Ex. A, Harkness Dep. at 15); (R. Doc. 351, Ex. A,
Chaikin Dep. at 11).

Although other *Green* factors point to BI's independence,
they do not prevent the Court from finding sufficient evidence of
a SBE to establish a *prima facie* case for jurisdictional
purposes.  It is true that there is limited evidence of common
ownership between the two companies that would confer common
control.  *Green*, 577 So.2d at 257.  Geoff Harkness and Alicia
Harkness, Karam's daughter and son-in-law, both own stock in BI
and one of the Crosby Companies.  But there is no evidence that

the Harkness' stock ownership represents a majority ownership in BI or that the Harkness' ownership interest in the Crosby Companies is controlling. Karam himself allegedly does not have an ownership interest in BI. (R. Doc. 318, Karam Aff.). And, while Karam is BI's president and a CE board member, (R. Doc. 318, Karam Aff.), BI and the Crosby Companies do not share other officers or directors.

In this case, however, stock ownership is not a useful proxy for "working control." *Grayson,* 778 So. 2d at 14. The documentary evidence suggests that Karam controls, without oversight, the financial operations of BI and the Crosby Companies. *See* discussion *supra;* (R. Doc. 351, Ex. A, Karam Dep.). The lack of knowledge by Crosby and BI's other officers and directors about company operations is testament to this fact. (R. Doc. 351, Ex. A, Harkness Dep. at 16 and 19); (R. Doc. 351, Ex. A, Chaikin Dep. at 11); (R. Doc. 351, Ex. A, Crosby Dep. at 224). Further, Karam withdraws money from BI and the Crosby Companies at will. (R. Doc. 351, Ex. A, Crosby Dep.) ("Q: Why would he be getting cash from your account–from the Crosby Construction account? A: Maybe I owe him. I don't know."); (R. Doc. 228, Ex. G)(Karam check written to "Cash" from BI checking account). Thus while Karam may not have common stock, his control of the financial operations of both BI and the Crosby Companies is nonetheless evident. *Grayson*, 778 So. 2d at 14

23

(looking at "control" as a proxy for ownership).  BI also argues
that it and the Crosby Companies are in separate lines of
business.  If true, BI has no good explanation for why the two
companies have their hands in each other's pockets.

In addition, the nature of the allegations in this case
further support application of the *Green* doctrine.  BI's
connection to the alleged fraudulent scheme is two-fold.  First,
claimants argue that BI participated directly in the fraud
through its president, Karam, who exerted financial control over
both BI and the Crosby Companies.  Karam allegedly moved funds
freely between BI and the Crosby Companies.  (R. Doc. 228).
Claimants reason that this was done in part for Karam's own gain
and in part to insulate assets from the operational expenses the
Crosby Companies incurred.  (R. Doc. 351, Ex. X).  And second, BI
allegedly benefitted from the fraudulent scheme.  (R. Doc. 228).
Karam transferred more than $20,000 of the money Bona Fide
invested in the Crosby Companies to BI, even though Bona Fide
agreed with Crosby that its investment was to be used for
specific purposes, such as the establishment of offices and
hiring of credentialed staff.  (R. Doc. 351, Ex. X).

In sum, many of the *Green* factors are present in this case
and on the whole, the evidence demonstrates that BI and the
Crosby Companies are not operated as distinct entities despite
their separate incorporation.  The underlying allegations of

fraud, and BI's alleged involvement therein, further persuades the Court that fusing BI and the Crosby Companies is an equitable result. Claimants must only make a *prima facie* showing of jurisdiction, *see Wilson*, 20 F.3d at 648, and the Court finds that they have done so.

**E.   Capes Investment, LLC**

Claimants make three arguments as to why Capes constitutes a SBE with the Crosby Companies. First, claimants argue that Capes's ownership interest in CE is sufficient in itself. (R. Doc. 351). Second, claimants argue that Karam controlled the financial operations of Capes and the Crosby Companies, and therefore the two are operated as one. (R. Doc. 384). And lastly, claimants argue that Karam, Crosby, and the Crosby Companies used Capes to extract assets from the Crosby Companies and thereby perpetuate the alleged fraud. *Id.*

First, the evidence demonstrates that Capes invested in and owns a 46 percent interest in CE. (R. Doc. 351, Ex. A, Karam Dep.). CE, in turn, maintains an interest in CC. (R. Doc. 351, Ex. A, Crosby Dep.). Capes's interest in the Crosby Companies is notably a minority one. Common ownership, however, is but one of *Green's* eighteen factors and is not dispositive. *Grayson*, 778 So.2d at 14. This is true even when the common ownership amounts to complete ownership, such as when two affiliated companies are wholly owned subsidiaries of a single parent corporation. *See*

*Town of Haynesville, Inc. v. Entergy Corp.*, *42,019*, 956 So.2d 192
(La. Ct. App. 2007) (holding that wholly owned subsidiaries were
not a single business enterprise); *see also Dickson*, 179 F.3d at
339 (noting the insufficiency of even complete ownership as the
sole premise upon which to pierce the corporate veil between
parent and subsidiary companies).  Capes does not own a
controlling share of CE, and claimants do not argue that Capes
controls CE or that CE's interest in CC is a controlling one.
(R. Doc. 351 and 384).  Capes's ownership interest in CE does not
therefore by itself support the conclusion that Capes and the
Crosby Companies constitute a SBE.

Second, claimants argue that Karam's common control of the
financial operations of Capes and the Crosby Companies suggests
that the companies are operated as a SBE.  (R. Doc. 351 and 384).
Karam, however, does not maintain an ownership interest in Capes.
(R. Doc. 351, Ex. A, Karam Dep.).  Nor is Karam an officer or
director of Capes.  *Id.*  The evidence suggests, in fact, that
Capes does not appear to be an operating company at all.  *Id.*
Rather, Capes serves as a vehicle through which individuals
invested in the Crosby Companies.  (R. Doc. 351, Ex. A).
Excluding its investment in CE, there is no record that Capes,
through Karam's control or otherwise, shared bank accounts,
commingled funds, or conducted any financial transactions with
the Crosby Companies.  (R. Doc. 351).  There is no evidence of

26

shared employees or intermingling of finances between the two.
(R. Doc. 351). Nor is there evidence that Karam commingled the
finances of Capes with his other businesses, such as BI. While
Karam may have had a role in soliciting investments in the Crosby
Companies through Capes, *see* R. Doc. 328, Pollekoff Dep., this
evidence does not make a *prima facie* case that Capes operates as
a SBE with the Crosby Companies.

Third, claimants argue that Capes's role in the alleged
fraud suggests that Capes constitutes a SBE with the Crosby
Companies. (R. Doc. 351). Specifically, claimants contend that
Crosby or Karam used Capes to withdraw money from the Crosby
Companies for personal gain. (R. Doc. 228, 367). The evidence
submitted suggests the opposite. Notably, the deposition
testimony suggests that Capes acted only as an investor in the
Crosby Companies. (R. Doc. 351, Ex. A). Karam solicited
individual investors in the Crosby Companies through Capes,
including his own family members. *See* (R. Doc. 351, Ex. A., A.
Harkness Dep. at 38-39). He offered each a guaranteed $30,000
for every $50,000 invested, not to mention $2,000 a month if the
promised return did not come into existence within an allotted
period of time. *See* (R. Doc. 351, Ex. A., A. Harkness Dep. at
38-39). There is no evidence, however, that Capes received money
from the Crosby Companies, or that Karam withdrew money from
Capes for personal use or for use by the Crosby Companies. *Id.*

Further, there is no evidence that Capes's investors have received any return on their investment.  *Id.*  Claimants have not demonstrated that Capes played a role in the alleged fraud perpetuated on claimants.

Capes shares office space with BI and the Crosby Companies. This, and Capes's investment in CE are *Green* factors, but without more, they are not probative of a SBE.  (R. Doc. 351).  Even drawing all reasonable inferences in claimants' favor, claimants have not made a *prima facie* case for jurisdiction.

## III. FAILURE TO STATE A CLAIM

## A.    Legal Standard

To survive a Rule 12(b)(6) motion to dismiss, the plaintiff must plead enough facts "to state a claim to relief that is plausible on its face." *Ashcroft v. Iqbal*, 129 S.Ct. 1937, 1949 (2009) (quoting *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 547 (2007)).  A claim is facially plausible when the plaintiff pleads facts that allow the court to "draw the reasonable inference that the defendant is liable for the misconduct alleged." *Iqbal*, 129 S.Ct. at 1949.  A court must accept all well-pleaded facts as true and must draw all reasonable inferences in favor of the plaintiff.  *Lormand v. U.S. Unwired, Inc.*, 565 F.3d 228, 232-33 (5th Cir. 2009); *Baker v. Putnal*, 75 F.3d 190, 196 (5th Cir. 1996). But the Court is not bound to accept as true legal

conclusions couched as factual allegations. *Iqbal*, 129 S.Ct. at 1949-50.

A legally sufficient complaint must establish more than a "sheer possibility" that plaintiff's claim is true. *Id*. It need not contain detailed factual allegations, but it must go beyond labels, legal conclusions, or formulaic recitations of the elements of a cause of action. *Twombly*, 550 U.S. at 555. In other words, the face of the complaint must contain enough factual matter to raise a reasonable expectation that discovery will reveal evidence of each element of the plaintiff's claim. *Lormand*, 565 F.3d at 255-57. If there are insufficient factual allegations to raise a right to relief above the speculative level, *Twombly*, 550 U.S. at 555, or if it is apparent from the face of the complaint that there is an insuperable bar to relief, *Jones v. Bock*, 549 U.S. 199, 215 (2007); *Carbe v. Lappin*, 492 F.3d 325, 328 & n. 9 (5th Cir. 2007), the claim must be dismissed. In a motion to dismiss for a failure to state a claim under Rule 12(b)(6), the Court may not consider materials outside the pleadings. *See* Fed. R. Civ. Pro. 12(b); *O'Quinn v. Manuel*, 773 F.2d 605, 608 (5th Cir. 1985)). In this respect, the Court's Rule 12(b)(6) analysis differs from the jurisdictional inquiry above, which considered depositions and affidavits outside the pleadings.

**B.  Discussion**

Claimants allege that BI, by and through its involvement
with Crosby, Karam, and the Crosby Companies, participated in a
scheme to fraudulently induce claimants to invest money in the
Crosby Companies. (R. Doc. 351). Claimants argument proceeds in
three parts: (1) the Crosby Companies are liable under the legal
theories asserted for their conduct and participation in the
alleged fraud, (2) BI constitutes a SBE with the Crosby
Companies, and therefore (3) BI shares any liability attributed
to the Crosby Companies. (R. Doc. 228). In opposition, BI
argues simply that claimants have not alleged sufficient facts to
state a plausible claim against it, based on its own specific
conduct, and independent of any actions of the Crosby Companies.
(R. Doc. 318). BI does not argue that claimants have not pleaded
sufficient facts to assert a plausible claim against the Crosby
Companies. Nor does BI argue that there are insufficient factual
allegations to allege a non-speculative right to relief against
it, if the Court finds that BI constitutes a SBE with the Crosby
Companies—as it did above for jurisdictional purposes. (R. Doc.
351). In short, the lynchpin of BI's motion to dismiss is that
it is not part of a SBE with the Crosby Companies. *Id.*

SBE theory is not restricted to jurisdictional analysis. It
is also a "vehicle for holding a group of affiliated entities
responsible for the obligations of one of the entities." *Lee*, 88
So.2d at 323. "When a group of corporations integrate their

resources to achieve a common business purpose and do not operate
as separate entities, each affiliated corporation may be held
liable for debts incurred in pursuit of the general business
purpose." *Brown*, 644 So.2d at 727.  Louisiana appellate courts
have applied the SBE theory to subject corporate capital assets
to liability in various contexts, including those at issue here,
such as intentional misrepresentation and breach of contract.
*See, e.g., Brown*, 644 So.2d at 727 (insurance fraud); *Lee*, 88
So.2d at 323 (employment contract); *Town of Haynesville*, 849
So.2d at 597 (contract claim without concurrently alleged fraud);
*Dishon v. Ponthie*, 918 So.2d 1132, 1136 (La. Ct. App. 2005)
(subcontracting).  Put simply, when part of a SBE, a corporation
ceases to have legal status of its own.  *Brown*, 644 So.2d at 727.
The cognizable legal entity is the SBE.  *Id.*  Establishment of a
SBE is a question of fact to be decided at trial.  *State ex rel.
Guste v. Green*, 657 So.2d 610, 615 (La. Ct. App. 1995).

The facts alleged allow the Court to draw the reasonable
inference that, if true, the defendant would be liable for the
misconduct alleged with the Crosby Companies, *et al.*, under a SBE
theory of liability.  *Iqbal*, 129 S.Ct. at 1949.  And BI does not
dispute that plaintiffs have alleged viable claims against the
Crosby Companies.  (R. Doc. 318).  BI's motions to dismiss are
therefore without merit and hereby DENIED.

**IV. CONCLUSION**

For the foregoing reasons, the Court GRANTS Capes's motions to dismiss for lack of personal jurisdiction. In addition, the Court DENIES BI's motions to dismiss for lack of personal jurisdiction and DENIES BI's motions to dismiss for failure to state a claim. (R. Doc. 318, 353, 354, and 367).

New Orleans, Louisiana, this  1st  day of February, 2010.

*Sarah Vance*
_____

SARAH S. VANCE

UNITED STATES DISTRICT JUDGE